AO 91 (Rev. 11/11) Criminal Complaint (Rev. by USAO on 3/12/20)   ☐ Original   ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

United States of America,

v.

SAMIR OUSMAN ALSHEIKH,

Defendant

Case No. 2:24-mj-04088-DUTY

LODGED
CLERK, U.S. DISTRICT COURT
JUL - 9 2024
CENTRAL DISTRICT OF CALIFORNIA
BY: rsm   DEPUTY

FILED
CLERK, U.S. DISTRICT COURT
7/9/2024
CENTRAL DISTRICT OF CALIFORNIA
BY: bm   DEPUTY

## CRIMINAL COMPLAINT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of January 7, 2023, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1425 | Attempted Naturalization Fraud |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Gerome Cheek
Complainant's signature

Gerome Cheek, HSI Special Agent
Printed name and title

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: 7/9/2024

City and state: Los Angeles, California

[Judge's signature]
Judge's signature

Hon. Jean P. Rosenbluth, U.S. Magistrate Judge
Printed name and title

AUSA: J.M. x0619

## AFFIDAVIT

I, Gerome Cheek, being duly sworn, declare and state as follows:

### I.   INTRODUCTION

1. I am a Special Agent with Homeland Security Investigations ("HSI") and have been so employed since July 2019. I am currently assigned to the Los Angeles Document and Benefit Fraud Task Force, which, among other things, is responsible for investigating immigration fraud. Prior to my employment by HSI as a Special Agent, I was employed as a Police Telecommunicator with the Charlotte Mecklenburg Police Department in Charlotte, North Carolina, from February 2016 to June 2019.

2. Since becoming an HSI Special Agent in 2019, I completed the Criminal Investigator Training Program at the Federal Law Enforcement Training Center in Glynco, Georgia. During the time I have been employed by HSI, I have investigated immigration violations, document fraud, mail fraud, bank fraud, wire fraud, unemployment benefit fraud, and other violations of federal law. I have participated in many aspects of criminal investigations, including reviewing evidence, analyzing immigration records, conducting physical and electronic surveillance, and executing search and arrest warrants.

### II.   PURPOSE OF AFFIDAVIT

3. This affidavit is made in support of a criminal complaint against, and arrest warrant for, SAMIR OUSMAN ALSHEIKH ("ALSHEIKH") for attempted naturalization fraud, in violation of 18 U.S.C. § 1425(a).

4. This affidavit is also in support of an application for a warrant to search ALSHEIKH, as described in Attachment A, for evidence of violations of 18 U.S.C. §§ 1425 (naturalization fraud) and 1546 (fraud and misuse of documents) (the "Subject Offenses"), as described in Attachment B. Attachments A and B are incorporated herein by reference.

5. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the

requested complaint and warrants and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. STATEMENT OF PROBABLE CAUSE

6. Based on my review of law enforcement reports, conversations with other law enforcement officers, and my own participation in this investigation, I know the following:

**A. ALSHEIKH Held Positions In The Syrian Government, Including As Head of Adra Prison and Governor of Deir Ez-Zour Province**

7. ALSHEIKH, 72, was born in Syria and spent most of his career in Syrian law enforcement and government security agencies. After completing his training at the Syrian Police Academy, he held a series of police command posts in the Damascus area, under the authority of the Interior Ministry.

8. At some point in the early 1990s, ALSHEIKH transferred to the Syrian Political Security Branch, a domestic intelligence agency focused on countering political dissent. He stayed at the Political Security Branch, in the Damascus area, until approximately 2005.

9. From approximately 2005 to 2008, ALSHEIKH was the head of the Damascus Central Prison, more commonly known as "Adra Prison," where the evidence indicates ALSHEIKH oversaw the severe physical mistreatment of political dissidents and other prisoners.

10. Bashar al-Assad has been the president of Syria since 2000. ALSHEIKH's conduct as head of one of Syria's largest prisons predates the Arab Spring and the beginning of the bloody Syrian civil war in 2011. However, even before the civil war began, the Assad regime worked to repress opposition to the government, and political dissidents (as well as ordinary criminals) were imprisoned at Adra Prison.

11. ALSHEIKH is an associate of Maher al-Assad, the younger brother of Bashar al-Assad, and a general and commander of Syria's 4th Armoured Division. According to multiple witnesses interviewed in this investigation, ALSHEIKH became acquainted with Maher al-Assad when they were both were members of the same equestrian club in Syria.

2

12. Syrian President Bashar al-Assad appointed ALSHEIKH governor of the province of Deir Ez-Zour in July 2011, after the uprising in Syria began. The photo below, published by the Emirati news site Al Bayan courtesy of the Syrian Arab News Agency, shows ALSHEIKH (left) and Bashar al-Assad (right) on July 25, 2011:



13. ALSHEIKH served for approximately one year as governor of Deir Ez-Zour, which is northeast of the Syrian capital of Damascus and was the site of some of the largest early demonstrations against the Assad regime. During the time that ALSHEIKH was governor of Deir Ez-Zour, Syrian military and security services conducted violent crackdowns against protesters.

**B.  ALSHEIKH Was Head of Adra Prison When Prisoners There Were Severely Physically Mistreated**

14. Based on investigation to date, while he was the head of Adra Prison from approximately 2005 to 2008, ALSHEIKH knew about, approved, and ordered the severe physical mistreatment of political dissidents and other prisoners at Adra Prison.

15. Based on interviews, law enforcement learned the following:

3

1. <u>Prisoner 1</u>

a. Law enforcement interviewed Prisoner 1 ("P-1"), who said he was imprisoned at Adra Prison for four to five months in 2007.

b. P-1 said ALSHEIKH was in charge of Adra Prison when P-1 was imprisoned there. P-1 remembered seeing ALSHEIKH twice. On one occasion, P-1 saw ALSHEIKH walking through the prison, surrounded by four or five deferential aides who treated ALSHEIKH as an authority figure. P-1 knew ALSHEIKH was in charge because everybody stood up when ALSHEIKH walked in.

c. On the other occasion, P-1 was visiting a part of the prison where there was a small window or hole through which a person could see what was known as the prison's "execution square." ALSHEIKH was present while three prisoners were hanged. P-1 saw ALSHEIKH only from behind, but he knew it was ALSHEIKH because his uniform had three stars and a bird—signifying that the individual was a brigadier general, the top position at the prison. The officers conducting the executions looked to ALSHEIKH for the go-ahead before proceeding with the executions.

d. P-1 was severely physically mistreated in the prison after a letter he wrote to Prisoner 2 ("P-2"), a political prisoner who was detained in a different part of Adra Prison, was intercepted. Guards removed P-1 from his cell and moved him to another room, where they attached P-1's shackled hands to the ceiling, leaving P-1 suspended off the ground. While P-1 was hanging by his arms from the ceiling—his body stretched out and defenseless—officers interrogated P-1 and the guards beat P-1 for approximately 20 minutes with their fists and with cables that resembled car jumper cables. During the beating, P-1 heard one guard tell another guard that they needed to speak to "Al Ameed"—the Arabic term for brigadier general—about what to do next. One of the guards left the room. When the guard returned, P-1 was put in a red suit and taken to a lower level of the prison. Red suits were assigned to prisoners designated for execution. The three prisoners P-1 had seen hanged were wearing red suits.

    e. While P-1 was detained in the lower level, a large, muscular guard strapped P-1 to a wooden panel shaped in the body of a person. P-1 was face up, flat on his back. The wooden panel had hinges in the middle, near the waist. The guard then forcibly folded together the upper and lower halves of P-1's body, bringing his feet up to his head, and in the process breaking his back. Additionally, while P-1 was strapped to the wooden panel, guards stomped on him.

    f. While detained in the lower level of the prison, the muscular guard also attempted to rape P-1, but P-1 fought him off.

    g. ALSHEIKH was not present when P-1 was beaten nor when his back was broken, but P-1 believes ALSHEIKH ordered the severe physical mistreatment because that kind of severe physical mistreatment had to be authorized by the head of the prison and because he was taken to the lower level only after the guards spoke of needing to confer with the head of the prison.

    h. After several days, P-1 was returned from the lower-level cell to a normal, above-ground prison cell. On several occasions he heard other prisoners screaming while he believed they were being severely physically mistreated. On one occasion he saw guards burning a prisoner with a heated metal rod that normally was used to extend a coffee mug over a fire.

  2. <u>Prisoner 2</u>

    a. Law enforcement interviewed P-2, who said he was imprisoned at Adra Prison from 2005 to 2011, after having traveled to the United States and met at the White House with then-President George W. Bush.

    b. Upon P-2's arrival at Adra Prison in November 2005, the head of security at the prison told P-2 that ALSHEIKH was the head of the prison. The next day, P-2 met with ALSHEIKH in ALSHEIKH's office. The office was marked by a sign that read "head of prison" and on ALSHEIKH's desk was a nameplate with ALSHEIKH's name. P-2 said this was a cordial meeting, during which ALSHEIKH said there were many demonstrators in Syria who were against what P-2 stood for (in other words, these citizens supported the Assad government).

    c.  P-2 saw ALSHEIKH ten to 15 times at Adra. Every few months, ALSHEIKH would walk through the halls of the prison. P-2 reported that ALSHEIKH's uniform had three stars and an eagle, which indicated he was a general and the head of the prison.

    d.  P-2 believes the Assad government wanted him to be killed in prison but in a way that would make it appear that the government was not responsible for his death. This was before the civil war in Syria began in 2011, at a time when Western nations still had diplomatic relations with Syria and at least one Western nation's embassy was advocating for his release. P-2 said ALSHEIKH ordered another prisoner to stab P-2 and later to poison him. When the prisoner refused, the prisoner was punished, although P-2 did not witness this.

    e.  P-2 said his high profile and international support protected him, to a degree, and he was treated better than most of the prisoners at Adra Prison.

    f.  P-2 said he was never physically abused in Adra Prison, but he saw other prisoners being physically abused.

    g.  After P-1's letter to him was intercepted, P-2 was brought to the office where P-1 was being interrogated. P-1's face was bloody and bruised, and P-2 saw guards hitting P-1 in the face and back of the head. P-2 said this could not have happened without ALSHEIKH's knowledge and approval.

    h.  On another occasion, P-2 said the prison's guards, who were employed by the Syrian Interior Ministry, were temporarily replaced by Syrian security services personnel. The security services personnel formed a gauntlet in the corridor and called prisoners out of their cells. P-2 saw and heard the security services personnel kick the prisoners and hit them with clubs, cables, and the stocks of their guns.

    i.  Around the same time, P-2 was moved to a cell below the ground, where he was questioned about how he had obtained a cell phone that he had used to communicate with individuals outside the prison. P-2 saw another prisoner (not P-1) being beaten in a nearby cell.

    j.  P-2 also said there were designated areas at Adra Prison where prisoners were severely physically mistreated and executed.

3.  Prisoner 3

a.  Law enforcement interviewed Prisoner 3 ("P-3"), a former Syrian politician, who said he was imprisoned at Adra Prison from 2001 to 2006 for challenging the Assad regime.

b.  P-3 said Adra Prison had four different wardens while he was imprisoned there, the last of which, beginning in 2005, was ALSHEIKH.

c.  Similar to P-2, P-3 believes the Assad regime wanted ALSHEIKH to kill P-3 without attracting global attention. According to P-3, one prisoner was ordered to poison P-3, but refused to do so. P-3 said ALSHEIKH arranged for violent sex offenders to share P-3's cell.

d.  P-3 believes he survived and was never physically harmed because leaders of Western nations advocated for his release.

e.  P-3 said he had approximately ten interactions with ALSHEIKH while he was a prisoner at Adra. P-3 knew ALSHEIKH was the head of the prison because he wore a uniform with three stars and a crown—indicating that ALSHEIKH was a brigadier general. When ALSHEIKH walked past, the prison guards would salute and stomp one of their feet in unison, something the guards did not do for other high-ranking prison officials.

f.  At one point during his imprisonment, P-3's blood pressure rapidly dropped to a dangerously low level. Recognizing that P-3 needed immediate medical attention, another prisoner, who acted as a de facto nurse in the prison, retrieved an oxygen tank for P-3. The next day, guards took the prisoner who had helped P-3 to ALSHEIKH's office, which was near P-3's cell. P-3 heard ALSHEIKH's voice and heard the prisoner screaming while being beaten with electric cables while in ALSHEIKH's office. P-3 believes the prisoner was severely physically mistreated because he had saved P-3's life. P-3 never saw that prisoner again.

g.  P-3 said he also saw other prisoners at Adra Prison whose bodies bore the marks of beatings with electric cables.

4. <u>Prisoner 4</u>

a. Law enforcement interviewed Prisoner 4 ("P-4"), who was an attorney in Syria and said he was imprisoned at Adra Prison for one year while ALSHEIKH was the head of the prison. The date and circumstances of P-4's imprisonment are unclear.

b. P-4 independently recalled the same incident recounted by P-2 and summarized above, during which Syrian security services personnel were brought in for several days in place of the usual Interior Ministry prison guards. Armed with batons, chains, and cables, the security services officers formed a line in the prison hallway. The officers called prisoners out of their cells and forced them to walk through the corridor, beating the prisoners as they walked past. P-4, who was not subjected to this treatment, said it took each prisoner about 10 minutes to walk through the gauntlet. Supervisors threatened to punish the security services officers if prisoners were not sufficiently bloodied by the end of the ordeal. During this event, prisoners were also stripped naked so the beatings with cables would cause more damage, dragged down stairs, and beaten unconscious. Some prisoners were then placed for five to six months in small underground cells, where they were provided insufficient food and severely physically harmed daily. Some of those prisoners died.

5. <u>Prisoner 5</u>

a. Law enforcement interviewed Prisoner 5 ("P-5"), who was imprisoned at Adra Prison on separate occasions in 2005 and 2006.

b. P-5 said that ALSHEIKH was the head of the prison both times he was detained at Adra Prison. The duration and circumstances of P-5's imprisonments are unclear.

c. P-5 met with ALSHEIKH twice while P-5 was a prisoner at Adra Prison. P-5 knows ALSHEIKH was in charge because ALSHEIKH stamped his signature as head of Adra Prison on formal documents. P-5 visited ALSHEIKH's prison office, which had a nameplate with ALSHEIKH's name.

d. P-5 said he was not physically mistreated while at Adra Prison and did not see or hear other prisoners being physically mistreated.

## C. ALSHEIKH Provided False Information To Obtain An Immigrant Visa And Immigrate To The United States

16. Based on investigation to date, including review of U.S. State Department records regarding ALSHEIKH's visa application and U.S. Citizenship and Immigration Services ("USCIS") records regarding ALSHEIKH's immigration to the United States, ALSHEIKH provided materially false information and concealed material information, which enabled him to unlawfully enter the United States and obtain status as a permanent resident.

17. On or about June 15, 2017, ALSHEIKH's wife, who naturalized as a U.S. citizen in 2013, submitted an I-130 Petition for an Alien Relative to USCIS. The I-130 petition is the first of a two-step process for a U.S. citizen or Lawful Permanent Resident ("LPR") to sponsor a foreign relative to come to the United States. USCIS reviews such petitions only to determine if the sponsor has a qualifying relationship to the person(s) being sponsored—in this case marriage. USCIS approved the petition on or about December 22, 2017.

18. On or about August 20, 2018, ALSHEIKH submitted a DS-260 Immigrant Visa Application to the U.S. State Department. The DS-260 application is the second step in the process for a foreign national to obtain an immigrant visa.

19. ALSHEIKH provided materially false information on his visa application by falsely stating that he had not committed, ordered, incited, assisted, or otherwise participated in extrajudicial killings, political killings, or other acts of violence. This statement was false because, as shown by the evidence summarized above, ALSHEIKH committed, ordered, incited, assisted, and otherwise participated in acts of violence against political dissidents and other prisoners at Adra Prison while he was the head of the prison from 2005 to 2008.

20. On or about August 26, 2018, and again on or about January 22, 2020, ALSHEIKH was interviewed at the U.S. Embassy in Amman, Jordan, under oath, regarding his visa application.

21. On or about January 23, 2020, the State Department approved ALSHEIKH's visa application.

9

22. On or about March 4, 2020, ALSHEIKH entered the United States at Los Angeles International Airport ("LAX") and became eligible for a green card as a LPR. If ALSHEIKH had not provided false information on his visa application, he would not have received the visa and he would not have been allowed to enter the United States or to become a LPR.

23. On or about March 25, 2020, USCIS issued and mailed to ALSHEIKH a physical copy of his green card, which does not expire for ten years. If ALSHEIKH had not provided false information on his visa application, he would not have received the visa, been allowed to enter the United States, become a LPR, or obtain a green card.

**D.     ALSHEIKH Provided False Information On His Naturalization Application**

24. Based on investigation to date, including review of the N-400 Application for Naturalization that ALSHEIKH submitted to USCIS, ALSHEIKH provided materially false information and concealed material information in his attempt to unlawfully procure U.S. citizenship.

25. On or about January 7, 2023, ALSHEIKH submitted an N-400 Application for Naturalization to USCIS.

26. ALSHEIKH provided materially false information in that application, including:

a.     First, ALSHEIKH falsely stated that he had never persecuted (either directly or indirectly) any person because of race, religion, national origin, membership in a particular social group, or political opinion. This statement was false because ALSHEIKH persecuted political dissidents who were prisoners at Adra Prison because of their political opinions while he was the head of the prison from 2005 to 2008.

b.     Second, ALSHEIKH falsely stated that he had never been involved in killing or trying to kill someone. This statement was false because ALSHEIKH knew about, approved, ordered, and participated in the execution of prisoners at Adra Prison while he was the head of the prison from 2005 to 2008.

c.     Third, ALSHEIKH falsely stated that he had never been involved in any way in badly hurting or trying to hurt a person on purpose. This statement was false because

ALSHEIKH knew about, approved, ordered, and participated in purposefully badly hurting political dissidents and other prisoners at Adra Prison while he was the head of the prison from 2005 to 2008.

   d. Fourth, ALSHEIKH falsely stated that he had never been a worker, volunteer, or soldier, and that he had not otherwise served in a prison or jail. This statement was false because ALSHEIKH was the head of Adra Prison from 2005 to 2008.

   e. Fifth, ALSHEIKH falsely stated that he had never been part of any group and had never helped any group, unit, or organization that used a weapon against any person, or threatened to do so. This statement was false because ALSHEIKH was part of the Syrian Interior Ministry, whose employees used weapons against political dissidents and other prisoners at Adra Prison while ALSHEIKH was the head of the prison from 2005 to 2008.

   f. Sixth, ALSHEIKH falsely stated that he had never given any U.S. Government officials any information or documentation that was false, fraudulent, or misleading. This statement was false because ALSHEIKH provided false, fraudulent, and misleading information on his DS-260 Immigrant Visa Application in 2018.

   g. Seventh, ALSHEIKH falsely stated that he had never lied to any U.S. Government officials to gain entry or admission into the United States or to gain immigration benefits while in the United States. This statement was false because ALSHEIKH provided false, fraudulent, and misleading information on his DS-260 Immigrant Visa Application and when he gave statements under oath at the U.S. Embassy in Jordan regarding his visa application in 2018 and 2020, the approval of which was necessary for him to obtain the visa that enabled him to enter the United States in 2020.

  27. In his N-400 application, ALSHEIKH provided a South Carolina address as his most recent residence, and provided two addresses within the Central District of California and one address in Syria as additional locations where he had lived during the previous five years. USCIS's records indicate that ALSHEIKH's N-400 application was electronically submitted to USCIS from a computer or other digital device within the Central District of California.

  E. **ALSHEIKH's Continuing Contacts And Connections In Syria**

  28. ALSHEIKH recently purchased a ticket to depart LAX on July 10, 2024, en route via Istanbul, Turkey, to Beirut, Lebanon. He does not have a return ticket.

  29. Based on my training and experience, and information obtained from various law enforcement personnel and witnesses who are familiar with Syria, individuals who wish to travel to Syria often get to Syria through Lebanon, which shares a border with Syria to the west.

  30. Since entering the United States in 2020, ALSHEIKH has traveled to Lebanon on two previous occasions. In both 2021 and 2022, ALSHEIKH flew from the United States to Beirut, Lebanon, each time returning to the United States a little less than six months later.

## IV. TRAINING AND EXPERIENCE ON THE SUBJECT OFFENSES

  31. Based on my training and experience, and the training and experience of other law enforcement officers who investigate the Subject Offenses, I know the following:

  a. Individuals who submit visa applications and applications for immigration benefits to the U.S. State Department or USCIS often do so electronically, including using digital devices. Individuals who submit such applications often keep records of such applications, as well as communications or relevant documents related to those applications, on their digital devices, including phones and other digital devices they keep on their persons.

  b. As noted above, ALSHEIKH submitted his N-400 application electronically, using a computer or other digital device, from the Central District of California. Accordingly, there is probable cause to believe that evidence related to that N-400 and other applications ALSHEIKH submitted with the falsehoods described above, will be found on digital devices ALSHEIKH has in his possession.

## V.    TRAINING AND EXPERIENCE ON DIGITAL DEVICES[1]

29. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

    a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

    b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

---

[1] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

    c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

    d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

  30. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

    a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

    b. Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

  31. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

    a. Users may enable a biometric unlock function on some digital devices. To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device. To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second. To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

    b. In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts. Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time. I do not know the passcodes of the devices likely to be found in the search.

    c. Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress ALSHEIKH's thumb and/or fingers on the device(s); and (2) hold the device(s) in front of ALSHEIKH's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

  32. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VI. REQUEST FOR SEALING

  33. I request that this affidavit be kept under seal to maintain the integrity of this investigation until further order of the Court, or until the government determines that these materials are subject to its discovery obligations in connection with criminal proceedings, at which time they may be produced to defense counsel. I make this request for the following reason:

15

          a.      First, this criminal investigation is ongoing and is neither public nor known to the subjects of the investigation. Disclosure of the search warrant, application, and this affidavit could cause ALSHEIKH and others to accelerate any existing or evolving plans to, and give them an opportunity to, destroy or tamper with evidence, tamper with or intimidate witnesses, change patterns of behavior, or notify confederates.

          b.      Second, there are witnesses and victims described in this application that have provided information to law enforcement. Although their names have been withheld from the Affidavit, their identities may be discernible to others based on the facts and circumstances of their statements. Public disclosure of these statements at this time could open the witnesses and victims to intimidation or retaliation from the subjects of the investigation or others.

## VII. CONCLUSION

34.    For all the reasons described above, there is probable cause to believe that ALSHEIKH has committed attempted naturalization fraud, in violation of 18 U.S.C. § 1425(a).

35.    Further, there is probable cause that evidence of violations of the Subject Offenses, as described above and in Attachment B of this affidavit, will be found in a search of ALSHEIKH, as further described above and in Attachment A.

Attested to by the applicant in accordance with the
requirements of Fed. R. Crim. P. 4.1 by telephone
on this __9th__ day of July, 2024.

_____
HONORABLE JEAN P. ROSENBLUTH
UNITED STATES MAGISTRATE JUDGE

16